UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
PAZ SYSTEMS, INC.,

                                              FINDINGS OF FACT AND
                       Plaintiff,               CONCLUSIONS OF LAW

   -against-                                       CV 05-4763 (LDW)

THE DAKOTA GROUP CORP., DAKOTA
SYSTEMS MANUFACTURING CORP.,
EDWARD OWSINSKI, and ROBERT WALSH,

                     Defendants.
------------------------------------------------------------X
APPEARANCES:

    OSTROLENK, FABER, GERB & SOFFEN, LLP
    BY: MAX MOSKOWITZ, DOUGLAS Q. HAHN and JOSEPH M. MANAK, ESQS.
    Attorneys for Plaintiff
    1180 Avenue of the Americas
    New York, New York 10036

    CARTER, BERNSTEIN, AUERBACH & DAZZO, P.C.
    BY: GEORGE EDWARD DAZZO, ESQ.
    Attorneys for Defendants
    77 Medford Avenue
    Patchogue, New York 11772

WEXLER, District Judge

Plaintiff Paz Systems, Inc. ("Paz") brings this action against defendants The Dakota Group Corp. ("Dakota Group"), Dakota Systems Manufacturing Corp. ("Dakota Systems"), Edward Owsinski ("Owsinski"), and Robert Walsh ("Walsh"). The action was tried before this Court, and the following are the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

### PAZ

Paz manufactures, sells and installs retail wall systems, including hardware and millwork

for use with those systems. One of Paz's products, for instance, is a "cash-wrap" – basically, a check-out counter at a retail store. Paz's customers are retail stores, such as Danice, The Buckle and G&G Shops, as well contractors and private residences.

Specialized knowledge is required to manufacture, sell and install Paz's retail wall systems, including computer designed drawings for die makers identifying the specifications necessary to produce the product. Paz's resale business also requires specialized tools and knowledge in the form of a computer and software to maintain the data required to service customers. The computer software used by Paz is called the "DBA" software. The DBA software is designed specifically for manufacturers and resellers and provides access to and stores data such as customer information, unit pricing, inventories, negotiated prices, vendor information, bid histories and invoices.

MICHAEL PAZ

Michael Paz is the sole owner and shareholder of Paz, a company he purchased from Felix Pax – his father and company founder – on January 1, 2004 for $250,000.00. Michael Paz is also the president and an employee of Paz Interiors, a company related to Paz.

EDWARD OWSINSKI

Owsinski was the director of engineering at Paz. He was employed by Paz for about 18 years and ran day-to-day operations both before and after Michael Paz purchased the company. Owsinski exercised wide discretion and decision-making authority. His duties included meeting with customers, inspecting job sites, gathering information, negotiating contracts and leases, preparing proposals and quotes, generating purchase orders and invoices, and hiring and firing employees. The only area over which he did not have complete control was that checks were

written by the accounting department at Paz Interiors.

PAZ'S COMPUTER NETWORK

Paz's computer network consisted of a server and three workstations. The DBA data was stored on the server and accessible from each of the workstations. Additional files, such as AutoCAD engineering drawings, were stored on Owsinski's individual workstation. Paz's computer network was stored in a building, protected by both commercial locks, passwords and an alarm system, including motion detectors.

OWSINSKI'S WORKSTATION COMPUTER

In March 2004, there was a problem with Owsinski's workstation computer. As a result, Michael Paz bought Owsinski a new workstation computer. Michael Paz asked Owsinski to upload all AutoCAD drawings that were on his workstation computer to the server and remove the computer from the network. Michael Paz initially instructed Owsinski to purge the hard drive on the old workstation computer, but Owsinski told Michael Paz that he had personal files on that computer and asked if he could keep the old workstation computer in the office. That computer did not have the DBA data because that data resided only on the server. Michael Paz agreed to let Owsinski keep the old computer in the office, provided it would not be connected to the network. Owsinski had the old workstation computer repaired in December 2004.

On January 7, 10 and 11, 2005, Owsinski copied data from the Paz servers onto the old computer (with the exception of AutoCAD drawings which were on the workstation, not the server). Michael Paz never authorized Owsinski to take any files or documents from Paz or to download the DBA data from the server onto the old workstation computer. At some point, Owsinski removed the old computer from Paz without purging the hard drive and without

Michael Paz's knowledge or consent.

OWSINSKI'S RESIGNATION

Sometime in January 2005, Owsinski proposed that he be made a 50% partner in Paz. Michael Paz rejected the proposal. Instead, Michael Paz offered to back Owsinski in a business doing related work. Owsinski never responded to the offer.

Owsinski tendered a letter of resignation on March 7, 2005. Michael Paz received this letter by e-mail while he was in Florida on vacation. Although the letter says "as we discussed," Michael Paz testified that this was the first notice he had that Owsinski was resigning. Michael Paz further testified that Owsinski told him he was starting a business with the Dakota Group and that Robert Walsh would be a 51% owner.

Before Owsinski left Paz, he met with Michael Paz for debriefing. In particular, they discussed outstanding jobs, most of which were not new projects but ongoing projects involving the tying up of loose ends. Owsinski's last day at Paz was March 16, 2005.

THE MISAPPROPRIATED PAZ DATA

In August 2005, Robert Caraciolo ("Caraciolo"), an employee of Dakota Systems, gave Michael Paz two CD-ROM disks (the "Caraciolo disks") that Caraciolo copied from computer files maintained at Dakota Systems. Caraciolo testified that he witnessed Owsinski using Paz data while Owsinski's was working for Dakota Systems. For example, a flyer to Hilton Garden Hotels, found on the Caraciolo disks, was a direct knock-off of a similar Paz document. Caraciolo also testified that he saw Owsinski modifying a Paz drawing for Dakota Systems.

The Caraciolo disks contained Paz drawings, schematics, and advertisements, including AutoCAD files and photographs of Paz's previous installations. Dakota Systems even used a

Paz photograph for an advertisement in the September/October 2005 edition of Retail Construction Magazine, where Paz also had an advertisement.

One of the Caraciolo disks contained a copy of Paz's DBA database, including a purchase and sales order accounting program containing several years of sales, client, inventory and purchasing data. This DBA database represented Paz's entire financial business, including accounts receivable, general customer information, customer lists including inactive/active status, sales orders, inventory items, invoices, bid histories, vendor lists and quotation histories.

Owsinski concedes that the Paz data on the Caraciolo disks was important to Paz to run its business. Indeed, Owsinski concedes that Dakota Systems created a "DBA" database that contained information similar to Paz's DBA database.

DAMAGES FOR MISAPPROPRIATION OF PAZ DATA

The evidence shows that Owsinski was using the misappropriated data to divert sales away from Paz and to Dakota Systems, beginning as early as January 12, 2005 – more than three months before he resigned from Paz. The evidence shows that Owsinski had Dakota Systems up and running immediately upon his resignation from Paz on March 16, 2005. By contrast, the evidence shows that it took Paz, albeit mainly through Owsinski's efforts, years to develop its DBA data. The evidence strongly suggests that Owsinski utilized the misappropriated Paz data to generate sales for Dakota Systems.

Paz estimates its damages from diverted sales in 2005 as $49,327.09. This calculation represents a percentage of Dakota Systems' total revenue of $118,319.90 from (1) sales diverted to Dakota Systems before Owsinski's resignation, and (2) sales diverted to Dakota Systems after Owsinski's resignation but priced and/or committed before his resignation, all of which occurred

in 2005. The percentages applied were 40% for resale items and 50% for wall system metal, representing lost profit and overhead.

Michael Paz testified that Dakota Systems' records showed that, excluding the diverted sales previously discussed, Dakota Systems had $93,339.96 in total revenue from sales to additional Paz customers in 2005. According to Michael Paz, by applying 40% for resale items, Paz suffered damages of $37,335.98 relating to customers whose information defendants misappropriated.

Michael Paz further testified that Dakota Systems' records showed that Dakota Systems had $179,939.10 in total revenue from sales to Paz customers in 2006. According to Michael Paz, by applying 40% for resale items, Paz suffered damages of $71,975.64 relating to customers whose information defendants misappropriated.

While a reference source for customers in the industry, referred to as the "Bloom Letter," contained thousands of names and leads, 86% of Dakota Systems' sales for 2005 and 93% of its sales for 2006 were to customers whose names were taken from the Caraciolo disks, i.e., Paz customers.

Owsinski testified that, from his experience in operating Paz, 10% is a realistic profit margin on jobs such as those involved in this action. According to Owsinski, a typical job involved a 30% markup over cost, leaving approximately 10% profit after factoring in overhead.

The Court finds that the 40% and 50% figures urged by Paz to calculate its damages are too high. However, the Court also finds that the 10% figure urged by Owsinski is too low. Rather, the Court finds that application of a 20% figure is reasonable under the circumstances. By applying the 20% figure, Paz's damages were $23,663.98 (20% of $118,319.90) for diverted

sales and $54,655.81 (20% of $273,279.06) for lost sales to Paz customers using the misappropriated data, for a total of $78,319.79.[1]

DAKOTA GROUP AND ROBERT WALSH

Owsinski testified that Walsh was a "self-proclaimed investor" in Dakota Systems but that he never actually invested any money in Dakota Systems. However, Walsh allowed Owsinski and Dakota Systems to operate in office space of the Dakota Group. Owsinski also testified that when he started Dakota Systems, Walsh was a cosigner to the Dakota Systems bank account until about June 2005. Dakota Systems also provided health insurance to Walsh, which it apparently provided only to employees. Nevertheless, the evidence does not show that Walsh was a director, officer or shareholder of Dakota Systems or that he was otherwise involved in its operations. In addition, the evidence does not show that Dakota Group was an owner of Dakota Systems or was otherwise involved in its operations.

DISCUSSION AND CONCLUSIONS OF LAW

A. PAZ'S CLAIMS

Paz asserts, inter alia, the following claims against defendants: (1) misappropriation of trade secrets; (2) unfair competition; and (3) breach of fiduciary duty.

Before analyzing these claims, the Court concludes that the evidence is not sufficient to

---

[1] Before and during trial, Paz Systems brought a motion to preclude the testimony of a third-party witness, Robert Shapiro ("Shapiro"), who testified for defendants. Shapiro testified that he was a former customer of Paz and Dakota Systems, and that Owsinski never told him or his company not to purchase from Paz. He also testified as to several purchases made through him by Joyce Leslie from Dakota Systems after Owsinski left Paz's employment. Paz Systems requests that Shapiro's testimony be stricken. Upon consideration, the request is denied, as the testimony does not, in any event, alter this Court's conclusions, below, holding defendants Owsinski and Dakota Systems liable to Paz for misappropriation of trade secrets, unfair competition, and breach of fiduciary duty.

hold Walsh or Dakota Group liable on any of these claims. Accordingly, these claims are dismissed as against Walsh and Dakota Group.

1. Misappropriation of Trade Secrets

As for Paz's misappropriation claim, the Second Circuit has observed that

> New York generally looks to section 757 of the first Restatement of Torts for its definition of a trade secret. Under this definition, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."

*Softel, Inc. v. Dragon Med. & Sci. Commc'n, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997) (citations omitted; quoting Restatement of Torts § 757, cmt. b, at 5 (1939)). In evaluating trade secrets, New York courts consider the following factors:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended in developing the information; (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Integrated Cash Mgmt. Servs. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990) (quoting *Eagle Comtronics, Inc. v. Pico, Inc.*, 453 N.Y.S.2d 470, 472 (4th Dep't 1982)); *Ecolab Inc. v. Paolo*, 753 F. Supp. 1100, 1111-12 (E.D.N.Y. 1991). Another factor considered is the method by which the data is acquired. As explained in *Ecolab Inc.*:

> In determining whether matter is protectable as a trade secret, courts frequently examine the method by which defendant acquired it, e.g., such as by stealing or copying . . . .
>
> Moreover, even if this information did not independently rise to the level of a trade secret, [the defendants'] wrongful

> retention of the customer information would justify treating it as a trade secret.

*Id.* at 1111-12. As further explained in *Panther Systems II, Ltd. v. Panther Computer Systems*, 783 F. Supp. 53 (E.D.N.Y. 1991):

> The fact that defendants *could* have secured the names of likely customers for [plaintiff's product] through alternative methods should not preclude denominating the information which was disclosed as a trade secret. While the names of potential customers may have been obtainable from a simple examination of a classified directory, information as to the retailers who were actually purchasing plaintiff's product could not have been so secured. Moreover, data concerning the amount of the product each customer purchased, compiled on a monthly basis, was certainly not obtainable in this way. Finally, as we have had occasion to note before, resolution of the issue in a case like this depends not upon how a defendant could have acquired the information, *but rather upon how he did in fact actually acquire it*. "It matters not that defendants could have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. The fact is that they did not. Instead they gained it from plaintiffs via their confidential relationship, and in so doing incurred a duty not to use it to plaintiffs' detriment."

*Id.* at 66 (emphasis in original; quoting *Heyman v. Ar. Winarick, Inc.*, 325 F.2d 584, 590-91 (2d Cir. 1963)).

An analysis of these factors establishes that the Paz data at issue was a trade secret. The evidence establishes that the Paz data was not known outside of its business and it was not openly available within Paz – indeed, Paz had numerous safety measures in place to guard its business information, including the DBA database. The Paz DBA data allowed Owsinski to have Dakota Systems up and running immediately upon his resignation from Paz. Such information would give a competitor a great advantage. Indeed, it took years of significant effort to develop the Paz data, including designs and customer names and related information, and

would have taken similar efforts for a competitor to generate such data. Moreover, Owsinski's wrongful taking and retention of the Paz data sufficiently establishes the trade secret status of that information.

In opposing this claim, defendants argue, <u>inter alia</u>, that there was no employment agreement between Paz and Owsinski. This argument is without merit. The absence of an employment agreement does not entitle a present or former employee to misappropriate his employer's protected information. Even in the absence of an express provision prohibiting the disclosure of such information, an employee privy to confidential information has a common law duty of good faith and fair dealing to his or her employer preventing disclosure to third parties. *See*, *e.g.*, *Anacomp, Inc. v. Shell Knob Servs., Inc.*, 1994 WL 9681, at *12 (S.D.N.Y. Jan. 10, 1994) ("Even though there is no evidence that [the employee] executed a proprietary information agreement with [the employer], employees in his position have been held to owe an implicit obligation of good faith and fair dealing to their employer."); *see also Thin Film Lab, Inc. v. Comito*, 218 F. Supp. 2d 513, 523 (S.D.N.Y. 2002) ("[A]n employee is free to compete with his or her former employer unless . . . fraudulent methods are employed." (quotations omitted)); *Panther Sys. II, Ltd.*, 783 F. Supp. at 65 ("[A]n employee's use of an employer's trade secrets or confidential customer information can be enjoined even in the absence of a restrictive covenant when such conduct violates a fiduciary duty owed by the former employee to his former employer." (quotations omitted)).

Accordingly, the Court concludes that Owsinski and Dakota Systems are liable to Paz for misappropriation of trade secrets.

As for damages, damages for misappropriation of a trade secret may be measured by

either plaintiff's losses or the profits unjustly gained by defendants through the use of the trade secret. *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87 (2d Cir. 1991); *Softel, Inc. v. Dragon Med. & Sci. Commc'n, Inc.*, 891 F. Supp.935, 942 (S.D.N.Y. 1995), *aff'd*, 118 F.3d 955 (2d Cir. 1997). Here, the evidence sufficiently establishes that Paz's damages were $23,663.98 for diverted sales and $54,655.81 for lost sales to Paz customers using the misappropriated data, for a total of $78,319.79.

Paz also requests punitive damages. An award of punitive damages is available where the defendants' conduct is "gross and wanton." *A.F.A. Tours, Inc.*, 937 F.2d at 87. Owsinski and Dakota Systems' misappropriation of Paz's trade secrets was particularly egregious, in the apparently calculated nature of the misappropriation and the lengths to which Owsinski went to hide his acts, including destroying evidence during this action. Accordingly, the Court awards punitive damages of $78,319.79.

2. Unfair Competition

As for Paz's unfair competition claim,[2] under New York law, "solicitation of an employer's customer by a former employee is not actionable unless the customer list could be considered a trade secret or there was wrongful conduct by the employee, such as physically taking or copying the employer's files or using confidential information." *Thin Film Lab, Inc.*, 218 F. Supp. 2d at 522 (quotations omitted); *Ecolab Inc*, 753 F. Supp. at 1111 ("Moreover, even where the information would not otherwise qualify as a trade secret, the unauthorized physical taking and exploitation of internal company documents, including detailed customer information

---

[2]First Amended Complaint ¶¶ 60-72. The amended complaint asserts unfair competition under the Lanham Act, but the facts alleged and the evidence adduced at trial demonstrate unfair competition under New York common law. The Court will deem the complaint amended in this respect. *See FRCP* 15(b).

by an employee for use in his future business or employment is to be enjoined as unfair competition.").

Here, the same acts that support a claim for misappropriation of trade secrets also support a claim for unfair competition. *See*, *e.g.*, *Advanced Magnification Instruments of Oneonta, N.Y., Ltd. v. Minuteman Optical Corp.*, 522 N.Y.S.2d 287, 290 (3d Dep't 1987) ("[A]n employee's illegal physical taking or copying of an employer's files or confidential information constitutes actionable unfair competition".).

As for damages, the evidence sufficiently establishes that Paz's damages were $23,663.98 for diverted sales and $54,655.81 for lost sales to Paz customers using the misappropriated data, for a total of $78,319.79.

Punitive damages are available under New York law for a claim of unfair competition. *See*, *e.g.*, *Getty Petroleum Corp. v. Island Transp. Corp.*, 878 F.2d 650, 657 (2d Cir. 1989) ("In the context of a claim for unfair competition, we have noted that 'New York law clearly permits punitive damages where a wrong is aggravated by recklessness or willfulness, . . . whether or not directed against the public generally . . . .' " (quoting *Roy Export Co. v. CBS, Inc.*, 672 F.2d 1095, 1106 (2d Cir. 1982))). Owsinski and Dakota Systems' wrong occurred under circumstances sufficient to justify punitive damages. Accordingly, the Court awards punitive damages of $78,319.79.

3. Breach of Fiduciary Duty

As for Paz's breach of fiduciary duty claim, Paz asserts that Owsinski breached his fiduciary duty by misappropriating Paz data and that Dakota Systems induced and/or benefitted from that breach. Under New York law, an employee has a common law duty of good faith and

fair dealing to the employer not to exploit its confidential information for the benefit of himself and others. *See Anacomp, Inc.*, 1994 WL 9681, at *12 (observing that employees with access to employer's confidential information have been held to owe an implicit obligation of good faith and fair dealing to their employer); *see also Lamdin v. Broadway Surface Advertising Corp.*, 272 N.Y. 133, 138 (1936) ("[An employee] is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties. Not only must the employee or agent account to his principal for secret profits but he also forfeits his right to compensation for services rendered by him if he proves disloyal.").

In his position at Paz, Owsinski had discretion to run all of Paz's operations, and he had access to Paz confidential information. As such, he owed a fiduciary duty to act for the benefit of Paz and not to exploit its confidential information for the benefit of himself and others.

The Court concludes that Owsinski breached his fiduciary duty to Paz, and that he and Dakota Systems are responsible to Paz for compensatory damages for such breach.

As for damages, the evidence sufficiently establishes that Paz's damages were $23,663.98 for diverted sales and $54,655.81 for lost sales to Paz customers using the misappropriated data, for a total of $78,319.79. *See LNC Investments, Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 465 (2d Cir. 1999).[3]

---

[3]Paz also asserts claims for tortious interference with business relations; unjust enrichment; conversion; and conspiracy under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. Given the Court's findings and conclusions on the misappropriation, unjust enrichment and breach of fiduciary duty claims, the Court need not reach the merits of these remaining claims, the first three of which would not, in any event, result in a different measure of damages, and the evidence is not sufficient to hold Walsh or Dakota Group liable on any of these claims. As for the RICO conspiracy claim, for which Paz seeks treble damages, this claim fails. The evidence is not sufficient to establish that defendants conspired to violate RICO's substantive provisions, that is, that they "agreed to form and associate themselves with a RICO enterprise and that they agreed to commit two predicate acts in furtherance of a pattern of racketeering activity in connection with the enterprise." *Cofacredit,*

B. REQUEST FOR ATTORNEY'S FEES FOR SPOLIATION

Paz requests attorney's fees for Owsinski's spoliation, that it, his deletion of documents and electronic files after this action was commenced. Upon consideration, the motion is denied.

CONCLUSION

For the above reasons, defendants Owsinski and Dakota Systems are liable to Paz for misappropriation of trade secrets, unfair competition and breach of fiduciary duty in the amount of $78,319.79, plus punitive damages in an amount of $78,319.79, for a total of $156,639.58. Paz's remaining claims against Owsinski and Dakota Systems are dismissed, and all claims against defendants Walsh and Dakota Group are dismissed. Paz's request for attorney's fees for spoliation is denied. The Clerk of Court is directed to enter judgment and to close the file in this action.

SO ORDERED.

_____/s/_____
LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
September 18, 2007

---

*S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 244 (2d Cir. 1999).